Gideon Kracov (State Bar No. 179815)
LAW OFFICE OF GIDEON KRACOV
801 S. Grand Avenue, 11th Floor
Los Angeles, CA 90017-4645
Tel: (213) 629-2071
Fax: (213) 623-7755
Email: gk@gideonlaw.net

Arthur Pugsley (State Bar No. 252200)
Melissa Kelly (State Bar No. 300817)
LOS ANGELES WATERKEEPER
120 Broadway, Suite 105
Santa Monica, CA 90401
Tel: (310) 394-6162
Fax: (310) 394-6178
Email: arthur@lawaterkeeper.org
Email: melissa@lawaterkeeper.org

Attorneys for Plaintiff
LOS ANGELES WATERKEEPER

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a non-profit corporation, <br><br> Plaintiff, <br><br> vs. <br><br> AJAX FORGE COMPANY, a corporation, DOES 1 through 10, <br><br> Defendants. | Case No. _____ <br><br> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES <br><br> (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

LOS ANGELES WATERKEEPER ("Waterkeeper" or "Plaintiff"), a California non-profit corporation, by and through its counsel, hereby alleges:

COMPLAINT                                    1

# I.    **INTRODUCTION**

1.    This complaint seeks relief for ongoing and continuous violations by Ajax Forge Company ("Defendant" or "AJAX") of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "Act") and the National Pollutant Discharge Elimination System ("NPDES") Permit No. CA S000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ and Order No. 2014-0057-DWQ ("Permit" or "General Permit") resulting from its industrial operations at 1956 East 48th Street in Vernon, California 90058 ("Facility").

2.    Millions of gallons of polluted storm water originating from industrial operations like those conducted at the Facility pour into storm drains and local waterways during every significant rainfall event. The consensus among agencies and water quality specialists is that this storm water pollution accounts for more than half of the total pollution entering surface waters each year.

3.    Los Angeles' waterways are ecologically sensitive areas and are essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Los Angeles' waterways provide aesthetic opportunities, such as wildlife observation, and public uses including both water contact and non-contact recreation.

4.    Industrial facilities, like the Defendant's, that are discharging storm water

COMPLAINT                                    2

and non-storm water contaminated with sediment, heavy metals, and other pollutants contribute to the impairment of downstream waters and aquatic dependent wildlife, expose people to such toxins, and harm the aesthetic and recreational significance Los Angeles' waterways have for residents of these communities and visitors alike.

## II.    JURISDICTION AND VENUE

5.    This is a civil suit brought under the citizen suit enforcement provisions of the Act.  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201–02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

6.    On January 3, 2017 Waterkeeper issued a sixty (60) day "Notice of Violation and Intent to File Suit" letter ("Notice Letter") to AJAX, including its registered agent for service of process, for its violations of both substantive and procedural provisions of the Act and Permit.  The Notice Letter informed Defendant of Waterkeeper's intent to file suit against it to enforce the Act and Permit.

7.    The Notice Letter was also sent to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); and

the Executive Officer of the California Regional Water Quality Control Board, Los Angeles Region ("Regional Board"), as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of the Notice Letter is attached as **Exhibit A**, and is incorporated by reference.

8.     More than sixty (60) days have passed since the Notice Letter was served on AJAX and the State and federal agencies.

9.     Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.  This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

10.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

III.   **PARTIES**

11.     Plaintiff is a non-profit public benefit corporation organized under the laws of the State of California with its main office located at 120 Broadway, Suite 105, Santa Monica, California 90401.

12.     Founded in 1993, Waterkeeper is dedicated to the preservation, protection and defense of the inland and coastal surface and groundwaters of Los Angeles County.  The organization works to achieve this goal through litigation and

COMPLAINT                                              4

regulatory programs that ensure water quality protection for all waterways in Los Angeles County.  Where necessary to achieve its objectives, Waterkeeper directly initiates enforcement actions under the Act on behalf of itself and its members.

13.    Waterkeeper has approximately 3,000 members who live and/or recreate in and around the Los Angeles basin, including many who live and recreate along the Los Angeles River and connected waters.  Waterkeeper members use and enjoy local waters and waterways to fish, surf, swim, sail, SCUBA dive, kayak, bird watch, view wildlife, hike, bike, walk, and run.  Additionally, Waterkeeper's members use the waters to engage in scientific study through pollution and habitat monitoring, and restoration activities.

14.    The unlawful discharge of pollutants from the Facility into the Los Angeles River and downstream waters impairs the ability of Waterkeeper members to use and enjoy these waters.  Thus, the interests of Waterkeeper's members have been, are being, and will continue to be adversely affected by the Facility's failure to comply with the Clean Water Act and General Permit.  The relief sought herein will redress the harms to Plaintiff caused by Defendant(s)' activities.

15.    Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff and its members, for which they have no plain, speedy or adequate remedy at law.

16.    Plaintiff alleges on information and belief that AJAX is an active California corporation, and, along with Fred Goble, is the Owner/Operator of the

Facility.

17.    Plaintiff is informed and believes, and thereon alleges, that AJAX has operated the Facility since at least 2002.

18.    The Notice of Intent to Comply With the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") filed by AJAX on June 25, 2015 ("2015 NOI") lists Fred Goble as the President of Ajax Forge Co., Inc.

19.    The 2015 NOI lists the Facility location as "1956 E 48th St., Los Angeles, CA 90058." However, information available to Waterkeeper indicates the Facility is located in the City of Vernon.

20.    Plaintiff is informed and believes, and thereon alleges, that the Registered Agent for AJAX is Bill Fisher at 1500 Quail Street, Suite 450, in Newport Beach, California, 92660.

21.    Upon information and belief, Plaintiff alleges that the true names, or capacities of DOES 1 through 10, inclusive (the "DOES"), whether individual, corporate, associate or otherwise, are presently unknown to Plaintiff, who therefore sue said Defendants by such fictitious names. Plaintiff will amend this Complaint to show their true names and capacities when the same have been ascertained. Whether or not AJAX is associated with any other individual, corporate, associate or otherwise was not immediately apparent through an initial investigation completed by Plaintiff.

22.    AJAX and DOES 1 through 10 are referred to collectively throughout

this Complaint as Defendant or Defendants.

## IV.   **LEGAL BACKGROUND**

### A.   **The Clean Water Act.**

23.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the statute. Among other things, section 301(a) prohibits discharges not authorized by, or in violation of, the terms of NPDES permits issued pursuant to section 402 of the Act, 33 U.S.C. §§ 1311(a) and 1342(b). The Act requires all point source discharges of pollutants to waters of the United States be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

24.    "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

25.    The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce.

26.    The Act confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the

navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

27.    A significant nexus is established if the water in question "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 780; *N. Cal. River Watch*, 496 F.3d at 999-1000.

28.    Section 505(a)(1) of the Act provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation…or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(1) and 1365(f).

29.    Defendant AJAX is a "person" within the meaning of section 502(5) of the Act. *See* 33 U.S.C. § 1362(5).

30.    An action for injunctive relief is authorized under section 505(a) of the Act. *See* 33 U.S.C. § 1365(a)(1).

31.    Each separate violation of the Act subjects the violator to a penalty of up to $51,570 per day for violations occurring after November 2, 2015; and up to $37,500 per day per violation for violations occurring prior to and including November 2, 2015. *See* 33. U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

32.    Section 505(d) of the Act allows prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and

consultants' fees. *See* 33 U.S.C. § 1365(d).

**B.    California's Storm Water Permit.**

33.    The State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

34.    Section 402(p) of the Act establishes a framework for regulating industrial storm water discharge under the NPDES permit program. 33 U.S.C. § 1342(p).

35.    Section 402(b) of the Act allows each state to administer an EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. *See* 33 U.S.C. § 1342(b).

36.    States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to discharge and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water discharges. *See* 33 U.S.C. § 1342(b).

37.    California is a state authorized by EPA to issue NPDES permits. The Permit is a statewide general NPDES permit issued by the State Board pursuant to the Act.

38.    Between 1997 and June 30, 2015, the Permit in effect in California was Order No. 97-03-DWQ, which Waterkeeper refers to herein as the "1997 Permit."

39.    On July 1, 2015, California re-issued the Permit pursuant to Order No. 2014-0057-DWQ's NPDES, which is referred to herein as the "2015 Permit."

COMPLAINT

40.    The 2015 Permit superseded the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more so, than the terms of the 1997 Permit. *See* 2015 Permit, Findings, ¶ 6.

41.    In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Permit and comply with its terms, or obtain and comply with an individual NPDES permit.  1997 Permit, Finding #2; 2015 Permit, Findings, ¶ 12.  Prior to beginning industrial operations, dischargers are required to apply for coverage under the Permit by submitting a NOI to the State Board. 1997 Permit, Finding #3; 2015 Permit, Findings, ¶ 17.

42.    Compliance with the Permit constitutes compliance with the Act for purposes of storm water discharges.  33. U.S.C. §§ 1311(b)(2)(A), 1311(b)(2)(E). Conversely, violations of the Permit are violations of the Act. 1997 Permit, Section C(1); 2015 Permit, Section XXI(A).

**C.    The Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations.**

43.    The Permit contains a Discharge Prohibition on the direct or indirect discharge of materials other than storm water ("non-storm water discharges") that is not otherwise authorized by an NPDES permit to waters of the United States. 1997 Permit, Section A(1); 2015 Permit, Section III(B).

44.    The Permit contains an Effluent Limitation that requires permittee facilities to reduce or prevent pollutants in storm water discharges through the

COMPLAINT

implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 40 C.F.R. §§ 401.15-16; 1997 Permit, Section B(3); 2015 Permit, Section V(A). BAT and BCT include both structural (e.g. installation of curbs to direct storm water flows) and non-structural (e.g. sweeping) measures.

45. In order to comply with the statutory BAT/BCT mandate, covered facilities must implement site-specific structural and non-structural Best Management Practices ("BMPs") designed to prevent or reduce discharges with pollutant concentrations that violate the Permit, and therefore the Act.

46. EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") include numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks") that are numeric thresholds to aid in determining whether a facility discharging industrial storm water had implemented the requisite BAT and/or BCT as mandated by the Act. *See* United States Environmental Protection Agency NPDES Multi-Sector General Permit for Storm Water Discharges Associated with Industrial Activity, as modified effective May 9, 2009.

47. EPA's Benchmarks serve as objective measures for evaluating whether the BMPs designed and implemented at a facility achieve the statutory BAT/BCT standards. *See* MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); *see also* MSGP, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); *see also* MSGP, 65 Fed. Reg. 64,746,

COMPLAINT                                        11

64,766-67 (Oct. 30, 2000).

48.     The State Board established Numeric Action Levels ("NALs") in the 2015 Permit. *See* 2015 Permit, Section V(A). NALs are derived from, and function similar to, EPA benchmarks. *See* 2015 Permit Fact Sheet, Section I(D)(5). Benchmarks and NALs represent pollutant concentrations at which a storm water discharge could impair, or contribute to impairing, water quality and/or affect human health.

49.     The Permit also contains various Receiving Water Limitations. 1997 Permit, Receiving Water Limitation C(1)-(2); 2015 Permit, Section VI(A). Receiving Waters are those surface or other waters to which pollutants are discharged from a given facility.

50.     The first Receiving Water Limitation is that stormwater discharges shall not cause or contribute to an exceedance of any applicable water quality standard ("WQS"). *Id*.

51.     WQS are pollutant concentration levels determined by the State Board, the various regional boards, and the EPA to be protective of the beneficial uses of the water that receive polluted discharges. WQS applicable to the discharges covered by the Permit include, but are not limited to, those set out in the *Water Quality Control Plan, Los Angeles Basin (Basin Plan for the Coastal Watersheds for Los Angeles and Ventura Counties)*, California Regional Water Quality Control Board, Los Angeles Region 4 (adopted June 13, 1994, as amended) ("Basin Plan") and in the Criteria for

COMPLAINT

Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

52.    The second Receiving Water Limitation is that storm water discharges shall not adversely impact human health or the environment. 1997 Permit, Receiving Water Limitation C(1); 2015 Permit, Section VI(B).

53.    The third Receiving Water Limitation is that concentrations of pollutants in storm water discharges shall not threaten to cause pollution or a public nuisance. *See* 2015 Permit, Section VI(C).

54.    The Facility violates the Permit's Receiving Water Limitation when its storm water discharges contain pollutant levels that: i) exceed an applicable WQS; ii) exceed levels known to adversely impact aquatic species and the environment; or iii) threaten to cause pollution.

55.    The Basin identifies the "beneficial uses" of water bodies in the region. The existing and/or potential beneficial uses of the waters to which AJAX discharges include, among others, municipal and domestic supply, groundwater recharge, water contact recreation, non-contact water recreation, warm freshwater habitat, wildlife habitat, wetland habitat, marine habitat, rare, threatened, or endangered species, preservation of biological habitats, migration of aquatic organisms, spawning, reproduction, and/or early development, and shellfish harvesting. Non-contact water recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but not normally involving contact with water where water ingestion is reasonably possible. These uses include, but are not limited to, picnicking,

sunbathing, hiking, beachcombing, camping, boating, tidepool and marine life study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities." Basin Plan at 2-2. Contact recreation use includes fishing and wading. *Id*.

56. Surface waters that cannot support the beneficial uses listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Act. According to the State Board's 2012 California Integrated Report on 303(d) impaired water bodies, Reaches 1 and 2 of the Los Angeles River are impaired by pollutants such as pH, cyanide, diazinon, lead, nutrients, ammonia, cadmium, coliform bacteria, copper, trash, zinc, and oil.[1] The Los Angeles River Estuary is impaired by, among other pollutants, chlordane, sediment toxicity, and trash.[2] The Los Angeles/Long Beach Harbor is impaired by at least chrysene, copper, sediment toxicity, mercury, and zinc.[3] The San Pedro Bay is impaired by sediment toxicity, and the Long Beach City Beach, one of the San Pedro Bay beaches, is impaired by indicator bacteria.[4]

57. Discharges of pollutants at levels above WQS contribute to the impairment of the beneficial uses of the waters receiving the discharges and constitute violations of the Permit and Act.

58. The Basin Plan also narrative standard, including that inland surface waters "shall not contain suspended or settleable materials in concentrations that

---

[1] STATE WATER RES. CONTROL BD., 2012 CALIFORNIA INTEGRATED REPORT, *available at* http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2012.shtml.
[2] *Id*.
[3] *Id*.
[4] *Id*.

cause nuisance or adversely affect beneficial uses." Basin Plan, 3-37.

59.     The Basin Plan also includes a toxicity standard requiring inland surface waters "be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in human, plant, animal or aquatic life." Basin Plan, 3-38.

60.     The CTR includes numeric criteria set to protect human health and the environment in the State of California.[5]

61.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQS are violations of the Permit's Receiving Water Limitations.

62.     WQS applicable to the Facility include, but may not be limited to, those detailed in TABLE 1.

**TABLE 1**
WATER QUALITY STANDARDS APPLICABLE TO AJAX FACILITY

| Parameter | Source | Numeric Limit |
|---|---|---|
| pH | Basin Plan | 6.5-8.5 s.u. |
| Al | Basin Plan | 1.0 mg/L |
| Cu | CTR | 0.013 mg/L (Criteria Max Concentration) |
| Zn | CTR | 0.120 mg/L (Criteria Max Concentration) |
| Pb | CTR | 0.0025 mg/L (Criteria Continuous Concentration) |

---

[5] U.S. ENVTL. PROT. AGENCY, WATER QUALITY STANDARDS; ESTABLISHMENT OF NUMERIC CRITERIA FOR PRIORITY TOXIC POLLUTANTS FOR THE STATE OF CALIFORNIA FACT SHEET, EPA 823-00-008 (Apr. 2000) *available at* http://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=p1007BKN.txt

**D.      The Permit's Planning and BMP Design Requirements.**

63.      Dischargers must develop and implement a Storm Water Pollution

Prevention Plan ("SWPPP") at the time industrial activities begin. 1997 Permit,

Sections A(1)(a) and E(2); 2015 Permit, Sections I(I) (Finding 54) and X(B).

64.      The SWPPP must identify and evaluate sources of pollution associated

with industrial activities that may affect the quality of stormwater and authorized non-

stormwater discharges from the facility.  1997 Permit, Section A(2); 2015 Permit,

Section X(G).

65.      The SWPPP must identify and describe site-specific BMPs to reduce or

prevent pollutants associated with industrial activity in storm water and authorized

non-stormwater discharges. 1997 Permit, Section A(2); 2015 Permit, Section X(H).

The SWPPP must also include BMPs that achieve pollutant discharge reductions

attainable via BAT and BCT. 1997 Permit, Order Section A(2); 2015 Permit, Section

I(D) (Finding 32), Section X(C).

66.      The SWPPP must include: i) a narrative description and summary of all

industrial activity, potential sources of pollution, and potential pollutants; ii) a site

map indicating the storm water conveyance system, associated points of discharge,

direction of flow, areas of actual and potential pollutant contact, including the extent

of pollution-generating activities, nearby water bodies, and pollutant control

measures; iii) a description of storm water management practices; iv) a description of

the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; v) the identification and elimination of non-storm water discharges; vi) identify and locate where materials are being shipped, received, stored, handled, as well as typical quantities of such materials and the frequency with which they are handled; vii) a description of dust and particulate generating activities; and viii) a description of individuals and their current responsibility for developing and implementing the SWPPP. 1997 Permit, Section A(1)-(10); 2015 Permit, Section X.

67.    The 2015 Permit further requires certain SWPPP enhancements, including a more comprehensive assessment of potential pollutant sources and more specific BMP descriptions. *See* 2015 Permit Sections X(G)(2), (4), (5).

68.    The objectives of the SWPPP are to identify and evaluate source of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify, design and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. 1997 Permit, Section A(2); 2015 Permit, Section X.

69.    The objectives of the requirement to develop, maintain and revise a SWPPP are to identify pollutant sources and develop BMPs that reduce or prevent polluted storm water from negatively affecting Receiving Waters and California communities. *See* 1997 Permit Section A(2); *see also* 2015 Permit Section X(C).

BMPs must achieve compliance with the Permit's Effluent Limitations and Receiving

Water Limitations.  To ensure compliance, the SWPPP must be evaluated and revised

as necessary.  *See* 1997 Permit Sections A(9)-(10); *see also* 2015 Permit § X(B).

Failure to develop or implement an adequate SWPPP (or revise an existing SWPPP,

as necessary) constitutes an independent Permit violation.  *See* 2015 Permit, Fact

Sheet, Section I(1).

70.    The Permit also requires that the discharger conduct an annual

comprehensive site compliance evaluation that includes a review of all visual

observation records, inspection reports and sampling analysis data, a visual inspection

of all potential pollutant sources for evidence of, or the potential for, pollutants

entering the drainage system, a review and evaluation of all BMPs to determine

whether the BMPs are adequate, properly implemented and/or maintained, or whether

additional BMPs are needed, and a visual inspection of equipment needed to

implement the SWPPP.  1997 Permit, Sections A(9)(a)-(c); 2015 Permit, Section XV.

71.    Section A(9)(d) of the 1997 Permit requires that the discharger submit an

evaluation report that includes an identification or personnel performing the

evaluation, date(s) of the evaluation(s) necessary SWPPP revisions, a schedule for

implementing SWPPP revisions, any incidents of non-compliance and the corrective

actions taken, and a certification that the discharger is in compliance with the Permit.

1997 Permit; Section A(9)(d)(i)-(vi).  If certification cannot be provided, the

discharger must explain in the evaluation report why the facility is not in compliance.

COMPLAINT                                    18

*Id.*, Section A(9)(d).  The evaluation report shall be submitted as part of the Annual Report specified in Section B(14) of the Permit. *Id.*

**E.    The Permit's Monitoring and Reporting Requirements**

72.    The 1997 Permit required facility operators to develop and implement a monitoring and reporting program ("M&RP") when industrial activities begin at the facility. 1997 Permit, Sections B(1)-(2) and E(3).  The 2015 Permit also requires implementation of an M&RP.  2015 Permit, Sections X(I) and XI.

73.    The objectives of the M&RP are to inform discharges about the effectiveness of BMPs designed in the planning phase and implemented on the ground.  Where the M&RP indicates that BMPs are not adequate to prevent or reduce pollutants in storm water discharges, permittees have an obligation to re-design BMPs and/or improve BMP implementation as necessary to ensure that storm water discharges are in compliance with the Permit's Discharge Prohibitions, Effluent Limitations and Receiving Water Limitations. *See* 1997 Permit, Section B(2); *see also* 2015 Permit, Sections X(I) and XI.

74.    The 2015 Permit requires facility operators to visually observe, monitor and sample storm water discharges to ensure that the facility is complying with its obligations under the Permit.  2015 Permit, Sections I(J) (Findings 55-56) and XI.

75.    The M&RP must be revised as necessary to ensure Permit compliance. 1997 Permit, Section B(2)(d); 2015 Permit, Section XI(A)(4).

76.    Discharges must conduct monthly visual observations of storm water

COMPLAINT                                                    19

discharges as part of a legally adequate M&RP.  1997 Permit, Section B(4)(a); 2015 Permit, Section XI(A).

77.    Dischargers must observe and document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in a discharge, and the source of any pollutants in storm water discharges from the facility.

78.    Dischargers are required to maintain detailed records of each observation, and corrective action taken to reduce or prevent pollutant from contacting storm water discharges.  *See* 1997 Permit, Section B(4)(c); *see also* 2015 Permit, Section XI(A)(3).

79.    The Permit requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants from entering surface waters from the facility.  1997 Permit, Section B(4)(c), 2015 Permit, Section XI(B)(1).

80.    The Permit requires dischargers to visually observe and collect samples of storm water discharges from each location where storm water is discharged.  1997 Permit, Sections B(5) and B(7); 2015 Permit, Section XI(B)(4).

81.    Section B(5)(a) of the 1997 Permit required dischargers to collect storm water samples during the first hour of discharge from the first storm event of the Wet Season and at least one other storm event in the Wet Season. All storm water discharge locations must be sampled. Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from

two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled.

82.    Section B(5)(b) required that sampling conducted pursuant to the 1997 Permit occur during scheduled facility operating hours that are preceded by at least three (3) working days without storm water discharge.

83.    Section XI(B)(1) of the 2015 Permit requires sampling from a Qualifying Storm Event ("QSE"), which is a precipitation event that produces a discharge for at least one drainage area and is preceded by forty-eight (48) hours with no discharge from any drainage area.

84.    Dischargers are required to collect samples of storm water within 4 hours of the start of facility operations if the QSE began within the previous 12-hour period, e.g. for storms with discharges that begin during the night for facilities with day-time operations. 2015 Permit, Section XI(B)(5)(b).

85.    Section XI(B)(2) of the 2015 Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

86.    Section XI(B)(11) of the 2015 Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via SMARTS within thirty (30) days of obtaining all results for each sampling event.

COMPLAINT

87.    The Permit requires dischargers to analyze each sample for pH, specific conductance ("SC"), TSS, and either total organic carbon ("TOC") or Oil & Grease ("O&G").  1997 Permit, Section B(5)(c)(i); 2015 Permit, Sections XI(B)(6)(a)-(b).

88.    Facilities classified as Standard Industrial Classification ("SIC") code 3462 (Iron and Steel Forgings) must to also analyze storm water samples for aluminum ("Al"), Iron ("Fe"), Nitrate + Nitrite Nitrogen ("N+N") and zinc ("Zn"). 1997 Permit, Section B(5)(c)(iii) and Table D; 2015 Permit, Section XI(B)(6)(d) and Table 1.

89.    The Permit also requires dischargers to analyze each sample for site-specific toxic chemicals and other pollutants associated with the specific industrial operations at the facility.  1997 Permit, Section B(5)(c)(ii); 2015 Permit, Section XI(B)(6)(c).

90.    On information and belief, Waterkeeper alleges that the Permit requires the Facility to test all storm water samples for lead ("Pb"), Copper ("Cu"), Nickel ("Ni"), Titanium ("Ti") and potentially other site-specific parameters.

91.    Section XI(B)(6) of the 2015 Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments, or approved Total Maximum Daily Loads.

92.    Section B(14) of the 1997 Permit required that dischargers submit an Annual Report to the applicable Regional Board by July 1 of each year. The Annual

COMPLAINT                                              22

Report must include a summary of visual observations and sampling results, an evaluation of the visual observations and sampling and analysis results, laboratory reports, the annual comprehensive site compliance evaluation report specified in Section A(9), an explanation of why a facility did not implement any activities required, and the records specified in Section B(13)(i).

93.    Section XVI of the 2015 requires dischargers to submit an Annual Report with a Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the 2015 Permit, an explanation for any noncompliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

## V.    STATEMENT OF FACTS

### A.    The AJAX Facility.

94.    The State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS") indicates the Facility has been enrolled in the program since February 20, 1992.

95.    SMARTS lists the Facility's coverage under the Permit as "Active."

96.    Waterkeeper is informed and believes, and thereon alleges, that AJAX first submitted an NOI for the Facility on September 18, 1992 ("NOI 1992"); then submitted a second NOI for coverage under the 1997 Permit on February 23, 1998

under the Waste Discharge Identification ("WDID") No. 4 19I000107; and then submitted a third NOI on June 25, 2015 under the same WDID number to continue coverage for the Facility under the 2015 Permit ("2015 NOI").

97.  The 2015 NOI certifies the Facility is classified under SIC code 3462.

98.  The 2015 NOI certifies that the Facility is approximately 40,000 square feet with approximately 44% impervious surfaces, including roofs.

99.  Waterkeeper is informed and believes, and thereon alleges, that the Facility serves the aerospace, defense and automotive industries.

100.  Waterkeeper is informed and believes, and thereon alleges, that industrial activities occurring on site include, but are not limited to, forging and hammering, chemical coatings/applications, welding, deburring, grinding/polishing, machinery and vehicle maintenance.

101.  EPA's Industrial Storm Water Fact Sheet for Sector AA: Fabricated Metal Products Manufacturing Facilities ("Sector AA Fact Sheet") indicates that polluted discharges from industrial activities like those conducted at the Facility commonly contain substances affecting pH; metals, such as iron, aluminum, and nickel; toxic metals, such as lead, zinc, cadmium, chromium, and copper; organics; chemical oxygen demand ("COD"); biological oxygen demand ("BOD"); TSS; fuel additives, gas/diesel fuel, O&G; coolants and solvents; acid/alkaline waste; and, trash and debris.

102.  Many of the pollutants described in the Sector AA Fact Sheet are on a list

of chemicals published by the State of California as known to cause cancer, birth defects, and developmental or reproductive harm. Discharges of polluted storm water to the local surface waters pose carcinogenic and reproductive toxicity threats to the public and adversely affect the aquatic environment.

103.    Waterkeeper is informed and believes, and thereon alleges, that the Facility also stores raw materials and waste materials, including hazardous waste designated under section 101(14) of Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). *See* 40 CFR 372.65.

104.    Waterkeeper is informed and believes, and thereon alleges, that the Facility is comprised of one large, open-air structure ("Hammering Department"), several small buildings that house shipping and receiving, an administrative office and other auxiliary services; a driveway to the East and an alleyway on the West side of the buildings; and a large rectangular yard North of the buildings, adjacent to an unused railroad right-of-way.

105.    On information and belief, Waterkeeper alleges that that the industrial activity conducted under the Hammering Department roof cannot be regarded as indoor industrial activity because the structure is not enclosed.  Any and all fumes, dust, particulates and similarly airborne pollutants associated with industrial activity undertaken under the Hammering Department roof are potentially exposed to stormwater upon outdoor deposition.

106.    Waterkeeper is informed and believes, and thereon alleges, that AJAX

operates at least four large industrial fans (approximately 4' diameter) under the Hammering Department roof. These fans are positioned and intended to cause the outdoor deposition of fumes, dust, particulates and similarly airborne pollutants generated under the Hammering Department roof.

107. On information and belief, Waterkeeper alleges that AJAX has not designed or implemented a single BMP to reduce or prevent the exposure of fumes, dust, particulates and similarly airborne pollutants to storm water.

108. On information and belief, Waterkeeper alleges that stormwater is discharged from at least three discharge points, designated by AJAX as South Driveway, East Driveway and West Driveway.

**B.      The Facility's Discharges and Receiving Waters**

109. The NOI 2015 lists the "Receiving Water" as the Los Angeles River. The Facility's storm water discharges flow to the storm drain system operated by the County of Los Angeles, specifically BI 0588-Line A, which directs collected water to Reach 2 of the Los Angeles River.

110. Waterkeeper is informed and believes, and thereon alleges, that the NOI 2015 erroneously failed to list the downstream Receiving Waters, which include Reach 1 of the Los Angeles River, the Los Angeles River Estuary, the Los Angeles/Long Beach Harbor, San Pedro Bay and the Pacific Ocean.

111. Waterkeeper is informed and believes, and thereon alleges, that each of the Receiving Waters is a water of the United States.

COMPLAINT                                             26

112.   Waterkeeper is informed, believes, and thereon alleges that the Facility's polluted discharges cause, threaten to cause, and/or contribute to the impairment of water quality in the Receiving Waters. Elevated levels of metals, nutrients, pathogens, and sediments have resulted in the inability of the Receiving Waters to support their beneficial uses.

113.   Although pollution and habitat destruction have drastically altered the natural ecosystem, the Receiving Waters are still essential habitat for dozens of fish and bird species, as well as macro-invertebrate and invertebrate species.

114.   On information and belief, Waterkeeper alleges that storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the special aesthetic and recreational significance the Receiving Waters have for people in surrounding communities, including Waterkeeper members.

115.   The public's use of the Receiving Waters for water contact sports and fishing exposes many people to toxic metals, pathogens, bacteria and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

C.    **Defendant's SWPPP and M&RP for the Facility**

116.   On information and belief, Waterkeeper alleges that AJAX has not developed or implemented, as of January 2017, a legally adequate SWPPP or M&RP.

117.   On information and belief, Waterkeeper alleges that on July 14, 2015 Jeff

COMPLAINT                                                                27

McElrath, President of AJAX, submitted to State Board a document purporting to be "just a portion of Ajax Forge SWPP application." The cover letter submitted with the document states that "the full application is kept on site at our facilty our swpp # is 4 19I000107…"

118. Waterkeeper is informed and believes, and thereon alleges, that the document submitted by AJAX on July 14, 2015 constitutes the Facility's current SWPPP and M&RP.

119. The document appears to be a form provided by the State of Michigan to guide an owner/operator in the development of a comprehensive pollution prevention plan for that state's NPDES permit.

120. The document fails to meet even basic SWPPP requirements, and fails to include any of the following: accurate and complete descriptions of areas of industrial activity, identification of significant industrial materials, description of industrial processes, the identification of potential sources of pollution and associated pollutants, descriptions of minimum and/or advanced BMPs to reduce or prevent polluted discharges, and a site map with information necessary for pollution prevention planning.

121. Waterkeeper is informed and believes, and thereon alleges, that the Facility SWPPP does not include an adequate assessment of the Facility's BMPs corresponding to potential pollutant sources and associated pollutants.

122. Waterkeeper is informed and believes, and thereon alleges, that the

Facility SWPPP fails to develop a legitimate and sincere M&RP. For example, information available to Waterkeeper indicates that the Facility has failed to collect the required number of storm water samples every year for at least the last 5 years. In fact, information available to Waterkeeper suggests that the Facility has collected only a single sample during that time—a sample that, as described below, contained massive exceedances of the only two parameters analyzed—pH and SC.

123. Waterkeeper is informed and believes, and thereon alleges, that AJAX has failed to analyze any samples collected at the Facility for each of the parameters required by the Permit and Act. As described herein, there are three sets of parameters that the AJAX Facility is required to analyze—basic parameters (pH, TSS, SC, O&G and TOC), industry-specific parameters (SIC 3462 requires analysis of samples for Zn, Fe, N+N and Al) and site-specific parameters (Pb, Cu, Ni, Cr, Titanium and potentially others). Information available to Waterkeeper indicates that the facility has largely failed to analyze storm water samples for even the basic parameters, and has never tested a single discharge for any metals.

124. On information and belief, Waterkeeper alleges that AJAX has been aware of the requirement to test for metals since as far back as 2003. Page 1 of the Facility's 2002-2003 Annual Report, as certified by Fred Goble, specifically identifies the requirement that the Facility analyze for industry-specific parameters, found in Table D of the 1997 Permit, including Zn, N+N, Fe and Al.

125. The 2011-2012 Annual Report, as certified by both Mark Chuha and

Frank De La Riva, similarly identifies four metals for which the Facility must analyze all storm water samples on account of its SIC code.

126.   A Notice of Violation ("NOV") issued by the Regional Board on August 29, 2011 specifically informed AJAX of its failure to analyze storm water samples for Zn, N+N, Fe and Al.  Based on this evidence, Waterkeeper alleges that Facility's failure to test for metals during each storm event has been knowing and willful.

127.   Waterkeeper is informed and believes, and thereon alleges, that industrial activities and material storage occur throughout the Facility outdoors without adequate cover or secondary containment to prevent storm water exposure to pollutant sources.

128.   Waterkeeper is informed and believes, and thereon alleges, that pollutants associated with the Facility include, but are not limited to substances affecting pH; metals, such as iron, aluminum, and nickel; toxic metals, such as lead, zinc, cadmium, chromium, and copper; organics; chemical oxygen demand ("COD"); biological oxygen demand ("BOD"); TSS; fuel additives, gas/diesel fuel, O&G; coolants and solvents; acid/alkaline waste; and, trash and debris.

129.   Waterkeeper is informed and believes, and thereon alleges, that without properly identifying all industrial activities, pollutant sources and pollutants in the SWPPP, the Facility Owner and/or Operator cannot and has not developed all appropriate BMPs.

130.   Waterkeeper is informed and believes, and thereon alleges, that without

properly identifying all industrial activities and significant materials in the SWPPP, the Facility Owner and/or Operator has not and cannot design or implement effective and legally defensible BMPs.

131.   Waterkeeper is informed and believes, and thereon alleges, that storm water sampling at the Facility demonstrates that the Facility's storm water discharges contain concentrations of pollutants above the Benchmark Levels, including, but not limited to: aluminum, iron, zinc, lead, copper and N+N.

132.   On information and belief, Waterkeeper alleges that AJAX has failed and continues to fail to submit Annual Reports that comply with the Permit's reporting requirements. For example, in each Annual Report since the filing of its 2011-2012 Annual Report, the Facility certified that: (1) a complete Annual Comprehensive Site Compliance Evaluation was done pursuant to the Permit; (2) the SWPPP's BMPs address existing potential pollutant sources and additional BMPs are not needed; and (3) the SWPPP complies with the Storm Water Permit, or will otherwise be revised to achieve compliance.

133.   Information available to Waterkeeper indicates that these certifications are erroneous. For example, as discussed above, storm water samples collected from the Facility contain concentrations of pollutants above Benchmarks and WQS, thus demonstrating that the SWPPP's BMPs do not adequately address existing potential pollutant sources.

   **D.**   **Defendant's Specific Violations of Effluent Limitations, Receiving**

## Water Limitations and Protections for Impaired Water Bodies

134.   On information and belief, Plaintiff alleges that the Facility has failed and continues to fail to reduce or prevent pollutants associated with industrial activity in storm water discharges through implementation of BMPs that achieve BAT/BCT as required by the Act and Permit.

135.   The Regional Board conducted an unannounced site visit at the Facility on August 3, 2011 at 12:20pm.  By 2:00pm the Regional Board had established that the Facility was out of compliance.  The Regional Board observed "major violations," including failure to develop a complete SWPPP, failure to develop a complete monitoring program, and failure to implement good housekeeping.

136.   The Regional Board's subsequent NOV issued to AJAX on August 29, 2011, which included photographs documenting specific violations, explained that the Regional Board's agent reported "exposed rusty metals and empty oil drums," as well as "[r]usty metal stains on the ground, metal residues and waste on the ground."

137.   On December 8, 2016, an agent for Waterkeeper conducted a site reconnaissance visit to the Facility.

138.   The Regional Board's descriptions and photographs from 2011 match with uncanny precision the state of the Facility as found by Waterkeeper on December 8, 2016.  From the sidewalk (North of the Facility) and abandoned railroad right-of-way (South of the Facility), Waterkeeper's agent noted rust stains covering most of the Facility's outdoor hardscape, rusty machinery and scrape metal piled and exposed

to the elements, dozens of oil drums on the ground without the benefit of any type of covering or secondary containment, massive quantities of metal waste and metal dust in virtually every part of the Facility.  Further, the sidewalk in front of the Facility is stained with rust, indicating regular and consistent exposure of public areas to iron.

139.    Waterkeeper alleges that observations by the Regional Board and Waterkeeper provide clear and convincing evidence of a continuous failure between 2011 and 2016 to implement even the minimum BMPs required by the Permit, and to take corrective action when prompted to do so by the State of California.

140.    Analytical results of storm water sampling at the Facility corroborate that AJAX has failed and continues to fail to develop and/or implement BMPs that achieve BAT/BCT.

141.    Waterkeeper is informed and believes, and thereon alleges, that the significant exceedances of EPA Benchmarks further establish that AJAX has failed and continues to fail to implement BMPs to prevent the exposure of pollutants to storm water, and to prevent discharges of polluted storm water from the Facility.

142.    AJAX submitted to the Regional Board analytical data for storm water collected on January 6, 2016, in which it found pH levels of 2.2 s.u., 2.1 s.u. and 2.2 s.u. at the West Driveway, South Driveway and East Driveway respectively.  The Benchmark for pH is a range between 6.0 s.u. and 9.0 s.u.

143.    The pH scale is logarithmic, i.e. a drop in the pH by 1.0 standard units is

1  equivalent to a 10-fold increase in acidity.[6]

2      144.   The storm water discharged from the Facility was 10,000 times more

3  acidic than the most acidic level acceptable to EPA.

4

5      145.   The January 6, 2016 samples collected and analyzed by AJAX document

6  that the Facility's storm water had a Specific Conductance ("SC") of 4900 ohms at all

7  three discharge points.

8

9      146.   SC is a measure of how well water conducts electrical current, and is an

10  indirect indicator of the presence of dissolved solids, including chloride, nitrate, zinc,

11  sulfate, phosphate, sodium, magnesium, calcium, iron and other conductive metals.

12

13      147.   The EPA's benchmark-equivalent numeric limit for SC is 200 ohms.

14  Thus, the storm water discharged from the Facility was almost 25 times higher than is

15  allowed under the Permit, and provide clear and convincing evidence that the Facility

16  is discharging metals in excess of the Permit's Effluent Limits.

17

18      148.   Waterkeeper conducted its own sampling on November 26, 2016 of

19  storm water discharged from the Facility and submitted samples to Weck Laboratories

20  for analysis (see TABLE 2).

**TABLE 2**
EXCEEDANCES OF BENCHMARK VALUES AT AJAX FACILITY

| Sample Date | Sample Point | Al (0.75 mg/L*) | N+N (0.68 mg/L*) | Fe (1.0 mg/L*) | Zn (0.117 mg/L*) | Cu (0.0636 mg/L*) |
|---|---|---|---|---|---|---|
| 11.26.16 | East Driveway | 1.4 mg/L | 1.4 mg/L | 6.3 mg/L | 0.40 mg/L | 0.110 mg/L |

*- numbers in parentheses are the benchmark numbers set out in the MSGP.

---

[6] *See* https://archive.epa.gov/water/archive/web/html/vms54.html.

COMPLAINT                                            34

149.   These data corroborate a continuing failure to reduce or prevent pollutants associated with industrial activity in storm water discharges through implementation of BMPs that achieve BAT/BCT by establishing exceedances of four metals and N+N, which is consistent with what experts would expect based on the pH and SC data described above in paragraphs 145-150.

150.   The Facility's storm water sampling data summarized herein in paragraphs 145-152 and TABLE 2 demonstrate that the Facility's discharges contain concentrations of pollutants that cause or contribute to a violation of WQS's established in the Basin Plan and by the CTR set out above in TABLE 1.

151.   On information and believe Waterkeeper alleges that storm water discharges from the Facility contain elevated concentrations of pollutants that also violate the Permit's second Receiving Water Limitation, which prohibit the discharge of pollutants that adversely impact the environment or human health.

152.   According to the EPA's 2012 303(d) List of Impaired Water Bodies, the Facility's Receiving Waters are impaired for, among other pollutants, lead, pH, copper and zinc.

153.   The Facility's discharges contain these pollutants at levels exceeding multiple numeric limits set for the protection of the environment and to protect the Receiving Waters beneficial uses.  Therefore, the Facility's discharges are adversely impacting the environment and causing further impairment of already stressed aquatic

systems.

154.   Further, heavy metals like zinc and lead are known to be associated with various human health problems, including respiratory and reproduction illnesses, cancer, pancreatic disorders, etc.  The Facilities discharges contain elevated concentrations of these pollutants, and evidence the Facility's adverse impact on the human health of communities that live, work and/or recreate in and around the Receiving Waters.

155.   Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## VI.    **CLAIMS FOR RELIEF**

### FIRST CAUSE OF ACTION
**Defendant's Discharges of Contaminated Storm Water in
Violation of the Permit Effluent Limitations and the Act
(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

156.   Waterkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

157.   Waterkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

158.   Waterkeeper is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve

COMPLAINT

compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the Act. *See* 1997 Permit, Effluent Limitation B(3); *see also* 2015 Permit, Section I(D) (Finding 32), Section V(A); *see also* 33 U.S.C. § 1311(b).

159.   Defendant violates and will continue to violate the Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

160.   Each and every violation of the Permit's Effluent limitations is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

161.   Defendant's violations of the Permit's Effluent Limitations and the Act are ongoing and continuous.

162.   By committing the acts and omissions alleged above, AJAX is subject to an assessment of civil penalties for each and every violation of the Act occurring from January 13, 2012 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

163.   An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

164.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## SECOND CAUSE OF ACTION
### Defendant's Discharges of Contaminated Storm Water in Violation of the Permit's Receiving Water Limitations and the Act
### (33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))

165.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

166.   Waterkeeper is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time storm water discharges from the Facility.

167.   Waterkeeper is informed and believes, and thereon alleges, that storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards has discharged and continues to discharge from the Facility each time stormwater discharges from the Facility.

168.   Plaintiff is informed and believes, and thereupon alleges, that since at least January 13, 2012, Defendant has discharged polluted storm water from the Facility causing or contributing to the violation of the applicable WQS and that adversely impact human health or the environment in violation of the Receiving Water

Limitation of the General Permit.

169.   Every day, since at least January 13, 2012, that Defendant has discharged discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

170.   Each and every violation of the Storm Water Permit Receiving Water Limitations is a separate and distinct violation of section 301(a) of the Act, 33 U.S.C. § 1311(a).

171.   By committing the acts and omissions alleged above, AJAX is subject to an assessment of civil penalties for each and every violation of the Act occurring from January 13, 2012 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

172.   An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which Waterkeeper has no plain, speedy, or adequate remedy at law.

173.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

COMPLAINT

**THIRD CAUSE OF ACTION**
**Defendant's Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

174.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

175.    Defendant has not developed and implemented an adequate SWPPP for the Facility.

176.    Each day since January 13, 2012, that Defendant does not develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

177.    Defendant has been in violation of the SWPPP requirements every day since January 13, 2012.  Violation continues each day that an adequate SWPPP for the Facility is not developed and fully implemented.

178.    By committing the acts and omissions alleged above, AJAX is subject to an assessment of civil penalties for each and every violation of the Act occurring from January 13, 2012 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

179.    An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

180.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a)

COMPLAINT

because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## FOURTH CAUSE OF ACTION
### Defendant's Failure to Develop and Implement an Adequate Monitoring and Reporting Program
#### (Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

181.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

182.   Defendant has not developed and implemented an adequate monitoring and reporting program for the Facility.

183.   Each day since January 13, 2012, that Defendant did not develop and implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous.

184.   By committing the acts and omissions alleged above, AJAX is subject to an assessment of civil penalties for each and every violation of the Act occurring from January 13, 2012 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

185.   An action for injunctive relief is authorized by Act section 505(a),

33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

186.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## FIFTH CAUSE OF ACTION
**Defendant's Failure to Accurately Certify Compliance in Annual Reports in Violation of the Permit and the Act**
**(33 U.S.C. §§ 1311, 1342, 1365(a) and 1365(f))**

187.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

188.   Defendant has not accurately certified compliance with the General Permit in each of the annual reports submitted to the Regional Board since at least January 3, 12012.

189.   Each day since at least January 13, 2012, that Defendant does not accurately certify compliance with the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). Defendant continues to be in violation of the General Permit's certification requirement each day they maintain an inaccurate certification of its compliance with the General

Permit.

190.     By committing the acts and omissions alleged above, AJAX is subject to an assessment of civil penalties for each and every violation of the CWA occurring from January 13, 2011 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

191.   An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

192.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## VII.   RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   Declare Defendant(s) to have violated and to be in violation of the Act as alleged herein;

b.   Enjoin Defendant(s) from discharging polluted storm water from the Facility unless authorized by the Permit;

c. Enjoin Defendant(s) from further violating the substantive and procedural requirements of the Permit;

d. Order Defendant(s) to immediately implement storm water pollution control technologies and measures that are equivalent to BAT or BCT and prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

e. Order Defendant(s) to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

f. Order Defendant(s) to prepare a SWPPP consistent with the Permit's requirements and implement procedures to regularly review and update the SWPPP;

g. Order Defendant(s) to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

h. Order Defendant(s) to pay civil penalties of up to $37,500 per day per violation for each violation of the Act since January 13, 2012, up to and including November 2, 2015, and up to $51,570 for violations occurring after November 2, 2015 pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

i. Order Defendant(s) to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

j.  Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

k.  Award any such other and further relief, as this Court may deem appropriate.

Dated: _____3/15_____, 2017

Respectfully submitted,

By: _____
Gideon Kracov
Attorneys for Plaintiff

COMPLAINT

45

EXHIBIT A